IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RICKY WHEELER, personally and as the
Special Administrator of the Estate
of GRETCHEN A. KONRAD, deceased,
and as the father and natural guardian of
L.W., a minor,
      Plaintiff,

vs.                                           No. 17-2249-JTM

UNITED STATES OF AMERICA,
      Defendant.

MEMORANDUM AND ORDER

Gretchen Konrad went to the Irwin Army Community Hospital on April 29, 2015, where she delivered an infant by C-section the following day. Konrad, however, died the same day, and her husband instituted this negligence action under the Federal Tort Claims Act, alleging, among other things, that IACH should have transferred Konrad to another hospital, such as Topeka Stormont Vail or the Kansas University Medical Center (KU). The United States has moved for summary judgment on the failure-to-transfer claim, arguing the plaintiff has failed to provide expert testimony to support such a claim.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment

as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

When Konrad arrived at IACH on April 29, 2015, she had protein in her urine, elevated blood pressure, elevated liver enzymes, and low platelets.[1] These findings led to a diagnosis of severe preeclampsia, which places a patient at risk for postpartum hemorrhage and hypovolemia.

Providers at IACH had labs drawn so that they could better assess Konrad's platelet count, in part because a low platelet count indicated a higher risk of bleeding and IACH had limited blood supply.

IACH nurses recommended that the hospital transfer Konrad to another facility, such as Stormont Vail or KU, in part because of concerns that too few nurses were on duty to care for Konrad as well as the other patients already under IACH's care. Dr. Brown, one of Konrad's prenatal physicians, also supported a transfer, based on the risk of bleeding, and the because the unit was very busy with limited staffing.

But ultimately Dr. Brown agreed with the decision to keep Konrad. It is disputed whether this resulted in any actual reduction in the level of service Konrad received. Defendant contends that Konrad in any event received one-on-one treatment at IACH.

---

[1] In the Pretrial Order, the parties have stipulated that "[a]n initial machine count of Konrad's platelets resulted in a count of 102," and a follow-up manual recount showed a platelet level of 165. The defendant argues that a level of 165 is not low (Dkt. 98, at 3), but does not controvert that IACH doctors diagnosed Konrad as suffering from severe preeclampsia.

IACH physicians decided not to transfer Konrad. Instead she was admitted for induction of labor. Apart from considering Konrad's platelet level, IACH providers did not order a blood coagulation study. IACH has no written policy, procedure or guideline for the diagnosis, treatment and/or management of HELLP (hemolysis, elevated enzymes, and low platelet) syndrome.

The next day, Dr. Nicholas performed a C-section. Afterwards, according to evidence cited by plaintiff, Konrad's blood pressure slowly decreased, her heart rate slowly increased, her urine output decreased, and she became extremely sleepy. The defendant disputes this, noting evidence that Konrad's blood pressure eventually rebounded, her urine output was variable, and that Konrad was sipping broth at 6:30 p.m.

After Konrad became unresponsive, was resuscitated, and had emergency exploratory surgery, IACH transferred her to Stormont Vail.

Drs. Bohman and Sibai state that a coagulation profile was required, and that if performed, it would probably have been abnormal and shown the risk of postpartum hemorrhage. The defendant denies plaintiff's assertion that the coagulation profile was triggered by the blood work showing low platelet, noting in particular Dr. Subai's deposition statement that a coagulation profile should have been given "irrespective of the platelet count and everything else."

The court finds that a coagulation study was justified, at least in part, on the low platelet results. Dr. Sibai was subsequently asked how the 1:30 p.m. blood draw

"specifically required the coagulation study," and responded: "The abnormalities in the liver enzymes." According to Dr. Bohman's report, "[a] coagulation profile was required due to the low platelet count," and that the profile should have been taken the afternoon or evening of April 29. Dr. Bohman believes that a maternal fetal medicine specialist would have appreciated the significance of coagulation studies before delivery, and that Konrad would have need blood products at or before delivery.

Drs. Bohman and Sibai opine that a coagulation study would have allowed providers to better understand Konrad's condition, increase their level of contact, and order serial blood counts. Dr. Bowman has stated that, after the C-section, a maternal fetal medicine specialist would have recognized decreased blood pressure, increased heart rate, and decreased urine output, along with administration of magnesium and morphine, as signs and symptoms of postpartum hemorrhage requiring more intense evaluation. Dr. Bowman states that, if Konrad's providers had ordered coagulation studies, ensured blood products were available, and provided for a maternal fetal medicine specialist, she would not have experienced hypovolemia, anoxic brain injury, and death.

The hypovolemia resulted from Gretchen Konrad's unrecognized post-partum hemorrhage that resulted from coagulopathy related to her severe preeclampsia, HELLP syndrome, and (possibly) acute liver disease.

**Conclusions of Law**

Defendant seeks dismissal of one element of plaintiff's claim—that it was negligent in failing to transfer Konrad to either Stormont Vail or KU. Defendant argues plaintiff has failed to show the failure-to-transfer was a proximate cause of Konrad's injuries because the plaintiff's designated experts, Drs. Bohman and Sibai, have no personal knowledge of the actual conditions at either Stormont Vail or KU at the time the transfer would have occurred. In support of its motion, defendant relies in particular on *Kenigsberg v. Cohn*, 117 A.D. 2d 652 (N.Y. App. Div. 1986). Plaintiff, in opposing the motion, cites in particular *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847, 850 (2008).

Wheeler's Rule 26 disclosures list only two witnesses from Stormont Vail who might testify as to Konrad's medical care—Dr. Ralph Park and Dr. Ernesto Cadorna. Dr. Park was a surgeon at Stormont Vail with the "General Surgery/Trauma" service who treated Konrad after her life-flight transfer from IACH. Dr. Cadorna was a hospitalist at Stormont Vail who Dr. Park consulted regarding Konrad's care.

The plaintiff contends that Dr. Bohman can testify how specialists would have treated Konrad. Dr. Bohman has no personal knowledge of how Stormont Vail or KU would or could have treated Konrad if she had been transferred there on April 29-30, 2015. He has stated that, based on his experience, he expected that at Stormont Vail or KU,

> [y]ou would have realized that the patient … was likely going to require various blood products of red blood cells, fresh frozen plasma, cryoprecipitate, platelets. And with those components that are readily

available, they could have then replaced those and ultimately, I think that her mode of delivery was going to be a cesarean whether she was at Stormont Vail or Irwin Hospital.

He further testified that at either KU or Stormont Vail:

having known what her situation is, she would have had more intense physician contact where patients would have been hands-on visualized, blood counts would have been serially done to maximize the health and well-being of this patient in the postoperative environment.

Asked about the grounds for his opinion that "the level of care, the availability of physical blood product, physicians things would be at a higher level" at Stormont Vail is based on his giving a diabetes lecture there a decade ago and remembering "their physical plant" from that time.

Dr. Bohman testified that his opinion is also based on his experience running a transport service and high-risk pregnancy unit, his experience as a maternal fetal medicine specialist, and his knowledge of the type of facility that has a level III maternity unit.

Dr. Baha Sibai, Wheeler's other maternal-fetal medicine expert, when asked how he could say that Stormont Vail or KU would have treated Konrad differently, testified "I cannot answer this question." Dr. Sibai based his opinion on his "expectation" of how maternal fetal medicine specialist would have treated Konrad, and not on any direct knowledge of how Stormont Vail or KU treat patients like Konrad. Dr. Sibai testified that tertiary care facilities are distinguished from community hospitals like IACH as "[w]ell, you know, tertiary care facilities where you have, you know, specialists, subspecialists,

7

particularly ICUs that have expertise managing critical care and bleeding disorders and so on."

Rather than focusing on particularized knowledge of the facilities at Stormont Vail or KU, plaintiff submits that Drs. Bohman and Sibai may testify based on their knowledge of the facilities offered by those type of institutions (Level III tertiary hospitals), in contrast to IACH (a Level II community hospital).

Level II facilities have obstetricians available at all times, limited blood components, nurses with competence in Level II care, and Level II nurseries. Level III facilities have maternal fetal medicine specialists with in-patient privileges available at all times, large blood banks, nurses with competency in level III care and special training and experience in managing complex maternal illnesses, and Level III nurseries.

Dr. Sessions, Department Chief of the Obstetrics Unit at IACH during Konrad's treatment, testified that IACH and Stormont Vail differ in that Stormont Vail has an ICU. The obstetricians who cared for Gretchen Konrad at IACH were not maternal fetal medicine specialists.

According to Dr. Bohman, based on his experience running a transport service and high-risk pregnancy unit, his knowledge of the type of facility that has a Level III maternity unit, and his visits to Stormont Vail, the failure to transfer Konrad to a tertiary facility caused or contributed to cause her death. Dr. Sibai has testified that the failure to transfer Konrad caused her death.

Dr. Bohman has testified that Stormont Vail would have accepted a transfer request, and IACH Nurse Officer in Charge Cowles testified that she had been involved in transfers from IACH to Stormont Vail and was not aware of any transfer request being denied. Defendant's OB/maternal fetal medicine expert, Dr. Richard Davis, testified that, based on his experience working at a tertiary care center, the center "pretty much had an open door" in accepting transfers.

According to Dr. Bohman, a hospital such as Stormont Vail would have treated patients similar to Konrad on a daily or every-other-day basis. If IACH had transferred Konrad to Stormont Vail or KU, more likely than not, a maternal fetal medicine specialist would have treated and managed her care before, during, and after her C-section. In addition, according to Bohman, a specialist would have recognized the need for a blood coagulation study. He testified that the records show "that there were most likely coagulation issues," and that "[a]t a hospital like Stormont Vail, this is a routine, common event that they understand very quickly and easily how to institute the very best care." Asked if this meant such experiences were "monthly" events, Bohn responded, "At Stormont, probably they would have seen some degree of this toxemia, I would say almost on a daily to every-other-day basis."

The court finds that plaintiff presented sufficient facts to warrant trial on the claim that a negligent failure to transfer Konrad was the proximate cause of her injuries. In its Reply (Dkt. 98, at 11-12), the defendant posits several questions which may certainly affect the ultimate weight to be accorded the opinions of Dr. Bohman and Sibai. But the

9

court finds no grounds for determining that these experts' conclusions should be disregarded and the failure-to-transfer claim resolved by summary judgment. The plaintiff's experts have testified that they are aware of the type of resources available to Level III facilities such as Stormont Vail and KU. The court finds that based on this knowledge, their opinions as to the effect of the failure to transfer Konrad are admissible.

*Kenigsberg*, cited by defendant, is a failure-to-transfer case, but other than that the case bears little resemblance to the present action. In that case, the plaintiff alleged that the defendant physician, Dr. Cohn, working at Maimonides Hospital erred in failing to certify a transfer for an infant (who was suffering chest burns from a hot water spill) to another hospital, Cornell Medical Center. The physician successfully treated the chest injury with a skin graft, but the infant suffered scaring on the thigh, the source of the graft.

Several facts distinguish *Kenigsberg*. First, the parents in that case were free to transfer the infant to Cornell and made arrangements to do so, until their insurer indicated it would approve a transfer only if "the necessary treatment could not be obtained at Maimonides. Cohn refused to provide such certification, *correctly claiming, as the evidence makes clear, that Maimonides was fully capable of rendering proper treatment*. Unable to obtain the certification, the Kenigsbergs were unwilling to go through with the transfer, and instead permitted Cohn to go ahead with the operation." 117 A.D.2d at 653 (emphasis added). That is, under the facts of the case, the transfer certification would have required "an untruthful statement to an insurance company." *Id*.

Second, the court stressed the speculative nature of plaintiff's evidence of a better result at Cornell. According to the court:

> the only testimony even remotely suggesting proximate cause was the statement by plaintiffs' expert that over-all results are "usually better" at specialized burn units such as Cornell. Given that there was no testimony that the skin graft procedure would have been done any differently at Cornell, such testimony falls far short of the necessary threshold showing for proximate cause, viz., that the conduct depriving the infant plaintiff of a better chance of success more probably than not resulted in her injury.

*Id.* at 653–54 (citation omitted).

Here, it is not uncontroverted that Konrad's treatment at IACH was the same as what she would have received at Stormont Vail or KU. More importantly, the opinions offered by Drs. Bohman and Sibai are far more specific in their explanation of how the treatment at those facilities would have differed from that at IACH.

Defendant attempts to distinguish *Esquivel*, the case cited by plaintiff, accurately noting (Dkt. 98, at 13) that the case was not explicitly a failure-to-transfer case, but a claim that a physician had failed to warn the parents of the gastroschisis, a fetal abnormality, revealed in a sonogram. Allowing for that distinction, however, the case remains relevant because it illustrates the standard for review of expert testimony at this stage of the litigation, and the permissible grounds for such testimony.

In *Esquivel*, the district court had granted summary judgment in favor of the defendant Dr. Watters, and the Court of Appeals affirmed, finding that the plaintiffs had failed to provide expert testimony that the failure-to-inform was the proximate cause of the infant's subsequent death. Before the Kansas Supreme Court, "the sole issue [was]

11

causation element, *i.e.*, whether the Esquivels supplied sufficient evidence of causation through their expert, Dr. Harlan R. Giles." 183 P.3d at 851. In his report, Dr. Giles stated that if the doctor had timely reported the abnormality, the case could have been referred to a maternal-fetal medicine specialist. The defendants argued that "it was uncontroverted that his failure to refer his patient was not the cause of the injuries," based on Dr. Giles' statement in his deposition that he "can't think of anything concrete" when asked if there was "anything that related to the delivery itself" that caused the infant's mortal injury. *Id.* at 850-51.

The supreme court held that the exchange did not warrant discarding the otherwise "clear opinion" that a fetal specialist referral and "a scheduled cesarean delivery at a tertiary center such as Wesley Medical Center" would have prevented the infant's death. *Id.* The deposition colloquy was insufficient to warrant summary judgment, because

> notwithstanding the cross-examination, Dr. Giles still held his opinion, to a reasonable degree of medical certainty, that Dr. Watters' breach caused the injuries. The fact that Dr. Giles did not personally observe the delivery or have other "concrete" proof of what exactly happened to the bowel during delivery would go to the weight of the expert's testimony. It would not render the expert's testimony so incredible as to justify summary judgment.

*Id.* at 851.

The court finds a similar result is appropriate here. The questions raised by defendant go to the weight to give the opinions of Drs. Bohman and Sibai. Because these

experts have testified that they are familiar with the care Konrad would have received at a level III maternity facility, they may provide evidence as to causation.

IT IS ACCORDINGLY ORDERED this day of November, that the defendant's Motion for Partial Summary Judgment (Dkt. 90) is hereby denied.

                                          s/ J. Thomas Marten
                                          J. Thomas Marten, Judge